

# NUMBER 13-17-00401-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TEXAS WINDSTORM INSURANCE
ASSOCIATION, BRUSH COUNTRY
CLAIMS, LTD., AND DAVID GUTIERREZ,                      Appellants,

v.

DAVID JAMES AND SUE JAMES,                             Appellees.

On appeal from the 60th District Court
of Jefferson County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Contreras and Justices Benavides and Perkes
Memorandum Opinion by Justice Perkes[1]

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T. CODE ANN. § 73.001.

Appellees David James and Sue James sued appellants Texas Windstorm Insurance Association (TWIA), Brush Country Claims, Ltd. (Brush Country), and David Gutierrez, for breach of contract and multiple violations of the Texas Insurance Code in connection with the handling of Hurricane Rita claims. The jury found in favor of the Jameses on several of their causes of action.

By seventeen issues, which we have reordered and consolidated, appellants argue: (1) conflicting answers to jury questions negate coverage under the policy; (2) there was no evidence of reasonable access, proof of loss, inventory of damaged personal property, or additional living expenses (ALE); (3) there was legally insufficient evidence that the loss reported was covered under the policy; (4)–(7) there was no evidence, and alternatively, factually insufficient evidence, of liability under the insurance code; (8) "no evidence supports reasonable and necessary attorney's fees"; (9) the Jameses failed to properly segregate their attorney's fees; (10) the Jameses' excessive presuit demand precludes award of attorney's fees, and the trial court erred when it failed to provide an instruction on presuit demand; (11) the trial court erroneously instructed the jury on comingled valid and invalid theories; (12) the trial court refused to submit an instruction on spoliation; (13) the trial court admitted irrelevant and prejudicial evidence at trial; (14) Sue has no standing to recover; (15) the Jameses are not entitled to prejudgment interest for periods of delay they caused; (16) the insurance code precludes recovery; and (17) the Jameses cannot recover against Brush Country or Gutierrez. We reverse and render in part and affirm in part.

2

# I.   BACKGROUND

The Jameses took out a home insurance policy on two properties in Groves, Texas (herein, the Berry and Garfield properties), through TWIA. The Jameses initially resided together at the Berry property and purchased the Garfield property in 2003 intending to "flip" it. Soon after, the couple separated, and David began living at the Garfield property as his primary residence.

On September 24, 2005, Hurricane Rita struck. Three days later, the Jameses' insurance agent, Mike Bedair, submitted an insurance claim for the Garfield property on their behalf. TWIA assigned the claim to its contracted adjuster, Brush Country, to investigate. On January 29, 2007, TWIA closed the claim, and the Jameses received a claim check for $13,650.81 for only roofing and siding repairs despite claiming interior and exterior dwelling losses in excess of $80,000.

At trial, the parties provided competing testimony of what transpired between September 2005 and January 2007, disputing the fulfillment of insured and insurer duties as prescribed by the Jameses' TWIA policy.

## A.   The Jameses' Witnesses

### 1.   Mike Bedair

Bedair, the Jameses' insurance agent, was the first individual to see the Garfield property after the storm. Like the Jameses, Bedair evacuated the area before the hurricane made landfall. Bedair returned one day later to inspect his clients' properties. "All I remember is there was damage," said Bedair of the Garfield home. "Seemed like there was roof damage." Bedair testified that the front and back door of the residence had been blown wide open, but he did not enter the home to inspect for further damage.

Bedair filed a claim on the Jameses' behalf. While he received the notice of claim acknowledgment and assignment from TWIA on September 29, 2005, Bedair denied that TWIA ever sent a proof of loss request and accompanied form within a fifteen-day period, as required by the Jameses' policy. Bedair said he was also never notified by appellants that the Jameses had been non-compliant with any policy terms.

On cross-examination, Bedair was questioned regarding letters sent from Brush Country to the Jameses indicating Brush Country was having difficulty communicating with the Jameses. While Bedair confirmed receipt of the letters, he denied taking any action and did not confirm whether the Jameses independently received the letters.

### 2.    Troy Caldwell

Caldwell, the Jameses' church friend and neighbor, lived down the street from the Berry property. Two days after the storm, he returned to town to check on his own home and ended up viewing "half a dozen" other homes belonging to friends and family. Caldwell testified he immediately became "alarmed" upon driving up to the Garfield property because it appeared as if "somebody had kicked the [front] door down." Caldwell said he grabbed his pistol before he entered the house. "[I]t was just [i]n absolute shambles. . . . As I cautiously walked around . . . , I noticed that the back door had been blown completely out of the jamb," said Caldwell. The walls appeared "filthy" and gray, and Caldwell stated, "I distinctly remember the whole inside of the house just being literally torn all to pieces, furniture and all. I ke[pt] going back to the cabinets because as I passed through[,] I was like[,] [']Dear, God. Man, how did this all happen?[']"

Caldwell said it did not occur to him to take photographs. He testified he was focused on surveying the properties, securing them if necessary, and reporting back to

4

the homeowners. Caldwell said he nailed the back door into the frame and shut the front door before he left the premises.

### 3. Sue James

Sue testified that by September 2005, her relationship with her husband "had deteriorated quite a bit," and the couple were no longer residing in the Berry home together. David was "working on" and "staying at" Garfield, which she described as an older two-bedroom, one bath home.

Before the hurricane hit, Sue evacuated to central Texas. She returned to Groves "[s]omewhere around the middle of October . . . just for the day" to check on the two properties. Sue testified that the front door of the Garfield home, although closed, "wasn't latched" shut. "You could just push the door and go on in." Meanwhile, the back door "had been blown off and had been nailed back just enough to keep it in the frame." The walls were wet, and the home smelled of mold, she said.

Seven months after the storm, with their TWIA claim still unresolved and fearing worsening damage to the residence, Sue said she and David began "tearing into the house, taking down sheetrock, [and] taking out insulation." Before "gut[ting] the house," the Jameses took photographs of the home's interior and exterior. Sue testified she created an inventory list of damaged personal property, developed the film they took, and electronically saved the photographs onto a C.D. "I took that C.D., along with hard copy pictures, and put it in the envelope, along with my inventory list. And I mailed it to TWIA. I did not send it certified." The Jameses sought reimbursement of $20,000 for the inventoried damages. Sue said they did not save any copies of what was mailed.

On cross-examination, Sue conceded that in addition to having no saved photographs of the interior damage, the couple did not keep receipts or invoices for any living expenses incurred or repairs completed. Sue explained that several people from the community had volunteered their time to assist in repairing the home and much of the materials had been donated.

### 4.     David James

David testified his initial contact with the first adjuster assigned to their claim, Gutierrez, was uneventful and respectful. The two men agreed to meet in November 2005, one month after the storm. On the eve of the scheduled November meeting, however, David said he was approved for a loan to purchase a trailer for temporary housing. The nearest available trailer in his price range was located in Austin and required pick-up on the same date as David's previously scheduled appointment with Gutierrez. David testified that he immediately contacted Gutierrez to reschedule, but the conversation quickly deteriorated. Gutierrez was "screaming so loud" that Sue was able to "hear every word he [was] saying."[2] David said the conversation concluded after he was told by Gutierrez, "'Well, I'll just put you at the end of December or later,' just as nasty as he could say it." "I had done everything I could [sic] tell him. We can't lose her job.[3] . . . We would have lost everything again," said David of forgoing the opportunity to buy the trailer and have stable housing once more. Up until then, David said he had been living out of a hotel.

---

[2] Sue corroborated David's testimony, stating she was privy to an antagonistic phone call between David and Gutierrez.

[3] Sue was employed with the U.S. Postal Service, and she returned to work after the hurricane.

After David purchased the trailer, he returned to Groves and parked the trailer on the Garfield lot. According to David, at some unspecified point, Gutierrez arrived unannounced on the property. Although it was not notated in Gutierrez's work logs admitted at trial, David said Gutierrez called him, told him he was "outside," and demanded to be shown the home. David testified he suffered from back problems and had recently "got[ten] hurt trying to get th[e] refrigerator out of the house." He was unable to get out of bed and asked Gutierrez to proceed into the Garfield residence without him. David said he offered to provide Gutierrez with written permission to inspect the property alone, but Gutierrez declined. David testified:

> I said[,] 'Well, the house is open. Go ahead. Look at everything you need to do.' [He said,] 'No, I have to have you with me.' And this is[,] like[,] I just got slapped, you know. Why does he need me? There's nothing I can do . . . So, I said[,] 'Go ahead. Just push the door. It's already open.' . . . And he says 'No, I have to see the roof'—no—'see the interior and the roof and I have to have you with me.' He just told me I need to go on the roof. I can't even get out of bed and walk, and he wants me to go on the roof with him. I said[,] 'That—that's not gonna happen.'

David maintained Gutierrez had "[full] access to do whatever he needed to do," and there was nothing preventing Gutierrez from investigating the home alone. He testified that the "house couldn't be closed up" because of the "water damage" to the doors. David, like Caldwell and Sue, also described a heavily damaged interior.

According to David, the next two assigned claims adjusters were just as problematic, and their adjuster worklogs were unreliable and "suspect" as they made retrospective references to several conversations which had not been previously documented. David denied making several statements attributed to him in the worklogs.

Disappointed with the lagging claims process, David and Sue decided to hire a structural engineer and a public adjuster in 2006. The Jameses first hired engineer

Charles J. Jenkins in March 2006. Jenkins physically inspected their property on March 30, 2006, and submitted his Structural Evaluation Report,[4] with attached photographs of the property, on May 13, 2006.

On September 13, 2006, the Jameses hired a public adjuster, Coy White. Following an inspection of the home on September 28, 2006, White presented them with an estimate of $89,930 in damages. White shared his estimate with the Brush Country adjuster and accompanied the adjuster during an inspection of the Garfield residence on October 17, 2006. Three months later, TWIA closed out its claim, and the Jameses received a check for only exterior damages.

### 5. Greg Becker

After filing suit, the Jameses retained Greg Becker, president and C.E.O. of Becker Engineering, in November 2007 to inspect the Garfield property and render an opinion.

As part of his assessment, Becker plotted where the home was, using latitude and longitude coordinates, against the hurricane pathway, which he based on coordinates provided by the National Oceanic and Atmospheric Administration. Becker opined that the "center eyewall of Hurricane Rita came within 620 feet of the James[es'] home." Becker believed the damages the Jameses claimed were consistent with his findings. According to Becker, the 60-year-old home was subjected to sustained ninety- to one-

---

[4] Jenkins did not testify. Jenkins's business records affidavit and report were admitted into evidence at trial and read, in relevant part:

> Based on the above[,] it is our opinion that the winds of the hurricane caused damage to walls and ceilings of the house and garage. Failure of the roof covering allowed sufficient water to enter the house to damage wall and ceiling coverings. This water intrusion was also probably sufficient to cause mold growth in insulation and wall and ceiling sheetrock. In this regard, based on the condition of the house, as reported by client, we would have expected this water damage to be sufficient to require removal of most, if not all, wall and ceiling coverings, as well as insulation.

hundred-mile-per-hour winds. He explained that once the doors were blown off, the house was exposed to a significant amount of water, wind, and debris blowing into the home horizontally for a sustained period of time.

> There's no doubt from the earlier photos that we had blown off shingles, sections blown off at the front, the eave was torn up. We've got a severe damage situation for the roof. . . . There's no doubt that that roof had to be replaced. You didn't have to sample the roof. All you had to do was see it.

Because the Jameses were unable to access their property or use a ventilation system to dry out their home within seventy-two hours of the hurricane's impact, the damages to the home's interior—which contained already compromised walls, ceiling, and flooring—worsened. The sheetrock, the ceiling, and the flooring were vulnerable, porous, and wet, said Becker. "[T]hey needed to go."

### 6.    Dan Guiter

Dan Guiter testified that his business, Dan Guiter, LLC, was hired in early 2008 to generate a report based on Becker's inspection.[5] On May 17, 2008, Guiter examined the Garfield residence. The home, although "livable," was still in the process of "being reconstructed very modestly," said Guiter. Guiter testified that Sue indicated to him what had been damaged by the storm and required replacing. Sue also relayed to him the kind and quality of materials the home was originally made of, and Guiter was then able to assess material costs required for re-construction of each room, "material by material, drywall, insulation, so forth, base boards all the way down." Pursuant to "ANSI/IICRC[6]

---

[5] Guiter explained that his business "provides problem building investigation services" and "litigation support for buildings that have been damaged or collapsed, as far as rebuilding estimates, costs incurred for reconstruction."

[6] According to the Institute of Inspection Cleaning and Restoration Certification (IICRC):

ANSI stands for the American National Standards Institute. They are an organization that oversees and verifies the development and use of national consensus Standards in many

9

standards for water restoration and mold remediation," Guiter testified that the home required removal of all sheetrock and insulation because the sheetrock had been exposed to moisture over seventy-two hours, and "black molds[,] which is the toxic mold, Stachybotrys type molds begin to grow."

Guiter determined that the total cost to repair the Garfield property was $119,000—more than what was assessed by White ($89,930) or initially, Brush Country ($60,639). Guiter stated his cost estimate did not account for depreciation or a policy deductible. Guiter noted that while the "scope of work was almost identical" between the three adjusters, there were some line item variations.

On cross-examination, Guiter conceded that 966 days had elapsed between the hurricane impact and his inspection. In addition to relying on the Jameses' eyewitness recount of damages sustained, Guiter stated he based his findings on Becker's report and personal experience. "[E]ight days after the storm, the damage would have been done. . . . I'm convinced that after eight days—[eight] days would have been no different than 20 days or 30 days or 40 days. The damage was done."

## B. Appellants' Witnesses

### 1. David Gutierrez

Gutierrez was the first insurance adjuster assigned by Brush Country in October 2005 to investigate the Jameses' claim. He remained assigned until December 2005, when he opted to leave the area after closing out all but two of his cases. Gutierrez, via testimony and written logs submitted at trial, provided the following timeline of events:

---

different industries. If a Standard is accredited by ANSI, it means ANSI has recognized and verified that the requirements for due process and consensus have been met by IICRC.

*FAQs*, Inst. of Inspection Cleaning & Restoration Cert., https://www.iicrc.org/page/IICRCStandards FAQs (last visited August 20, 2020).

- October 2, 2005 – Gutierrez received a notice of loss and claim acknowledgment from TWIA. He attempted to contact the Jameses on the same day, calling the phone number provided by the insureds in their claim form, and left a voicemail.

- October 4, 2005 – Gutierrez attempted to contact the Jameses again and left a voicemail.

- November 6, 2005 – Gutierrez received a call from David. "He says he has to [']cancel our appointment' for tomorrow of 11/7/05." Gutierrez agreed that the Jameses "more than likely" called prior to this date, but it was not notated in his log. Gutierrez testified he was told by David that his "doctor advised him to move out of the dwelling. So, Monday he's going to try to purchase a mobile home he can put on the property." David and Gutierrez agreed to schedule an appointment for Friday, December 6, Gutierrez's next availability.

- December 5, 2005 – Gutierrez received a call from David. His log states:

  [David is] saying he was going to write the company a letter outlining why he does not want an inspection at this time. . . . He says he wants to get all his business in order before he has an inspection. He says he has talked to several friends in his church, contractors and others, telling him how the company will take the adjuster estimate and refuse to make proper allowance on the claim.

  Gutierrez testified that the conversation became "heated" after he "tried to explain that this simply was not the truth." "[David] would not let me finish any statement and wanted to continue to bad mouth me and the company."

- December 7, 2005 – Gutierrez sent a letter to the Jameses stating:

  Dear Mr. James, as you know, we've been trying to work with you on the adjustment of your windstorm claim due to Hurricane Rita for the property at [Garfield]. Your claim has been open about 60 days. Please refer to page 5 of your policy and review Condition 4. Duties After A Loss. . . . It is your duty after the loss to file a proof of loss within 91 days of our request. It's

11

our duty to provide you with the form. TWIA requested a proof of loss when they acknowledged your claim in writing about 60 days ago. Attached is a blank proof of loss form for use when filing the proof. Your deadline to file is January 2, 2006.

At trial, Gutierrez explained that the "purpose of a proof of loss [form] is for an insured to state to the company what they feel that their claim is worth." Gutierrez was questioned as to why the proof of loss form sent to the Jameses was not blank, but rather, had zeros in the column signifying the amount of the Jameses' total reported loss. Gutierrez conceded that it was "standard practice" for TWIA to send insureds a proof of loss form with zeros typed in, requesting that insureds return it signed and notarized.

While Gutierrez recognized that Groves received a direct hit from Hurricane Rita and "[f]rom what Mr. Caldwell [testified at trial], [it] sounds like" the interior of the Garfield home was affected, Gutierrez maintained he never personally observed the interior or exterior of the home to verify the damages himself. Gutierrez additionally claimed that he was "never informed" of any interior damage by the Jameses; thus, Gutierrez said he was unable to provide TWIA with an estimate of the Jameses' loss.

Gutierrez testified that his pay as an adjuster was on a contingency basis. Until and unless he submitted a claim for damages, he was not paid. The more damages he found, the more money he made, he said. In this case, Gutierrez contends the Jameses never allowed him on their property; therefore, he submitted nothing, and he was paid nothing.

When pressed regarding why he did not visit the Jameses' property even if unaccompanied by David or Sue, Gutierrez stated it would have been impractical to "drop by" the homes of every assigned insured without prior appointment. "I was able to look at

every property on here except the James[es']," testified Gutierrez, referencing his adjuster assignment list.

**2.    Richard Myers**

Myers, president of Brush Country, spoke "on behalf of Brush" at trial. Brush Country confirmed it was originally assigned to the Jameses' case by TWIA in September 2005. After Gutierrez departed, the case was reassigned to adjuster Clayton Grossman. The following dates were provided via testimony and exhibits admitted at trial:

- January 2006 – Grossman attempted to contact David via phone on January 8, January 16, and January 26.

- February 17, 2006 – Grossman left a paper notice at the Garfield residence.

- March 6, 2006 – Grossman spoke with the couple for the first time since the re-assignment. David told Grossman that "he ha[d] an engineer coming in this week." After Grossman explained to David that he "need[ed] to inspect the risk" before Brush Country would be able to review the engineer report, David became belligerent and said "he [was] in the process of filing a lawsuit against TWIA and previous adjuster." Grossman reported the incident to his then-supervisor, Lanny Hutson,[7] and he requested to be removed from the case.

- May 8, 2006 – Hutson sent a letter to the Jameses stating in part:

  This will confirm our telephone conversation at which time I gave you my telephone number and you were to call me back so we could set an appointment for me to inspect your damages.

  Previously adjuster David Gutierrez attempted to set an appointment with you[,] and he advised you refused to meet with him. We cannot properly

---

[7] Hutson, who has since retired, testified during appellants' case-in-chief. Hutson said he was aware of the problems Grossman and Gutierrez had with the Jameses. After Grossman told him "that he couldn't work with them anymore," Hutson reassigned the claim to himself.

evaluate your damages until we are able to inspect the premises. Terms and conditions of your policy agreement state that you will allow us to inspect and evaluate the damages to an insured property. . . .

- June 2, 2006 – Hutson drove by the residence and took exterior photographs. He attempted to contact the couple to no avail. In a written report to TWIA, Hutson stated, "I drove by the house and no one was at home. The roof is tarped and due to the attitude of the insured, I did not feel we should make any effort to climb on the roof as the insured might consider this trespassing."

- June 7, 2006 – Hutson sent a subsequent letter to the Jameses, stating:

  This will supplement our previous letter sent to you dated May 8th. To date we have had no response to this letter. Mr. James we are unable to determine your damages unless we are allowed to inspect the property. Due to us not hearing from you, we can only assume you do not want to pursue a claim under this policy. If we do not hear from you within 10 days from the date of this letter, we will close our file.

- June 21, 2006 – David called Hutson and agreed to arrange an appointment at a later, yet-to-be-determined date for Hutson to inspect the property.

- June 23, 2006 – Hutson called David to notify him he would be in the region to view the property but was told by David that he "would not be available."

- August 17, 2006 – Hutson emailed TWIA, notifying them that David had "contact[ed] [him] today and apologized[,] saying he had been on a lot of medications and was not himself." According to Hutson, David "stated he had a structural engineer look at his house and wanted to set an appointment within the next couple of weeks to look at his damages. He is to call me the first part of next week to try and set up an appointment."

- September 14, 2006 – Hutson sent a report to TWIA stating in part:

As indicated in our previous reports, the insured called me and seemed a lot more cooperative. We have followed up with him on our last two visits to this area[,] but he has not allowed us to inspect the property at [Garfield], Groves, Texas.

Due to the attitude of the insured, we did not take it upon ourselves to make a close inspection of the property without anyone being there. We have obtained photos of the property and it does appear the tarp has blown off and no effort to protect the property has been made. The insured keeps telling me he is on strong pain medication and sometimes he is not himself and is very brash for which he apologized. He also says he and his wife may have to split up because of the damage at his residence and at this house. He keeps wanting us to inspect the property at [Berry,] which I assume is the residence where they were residing at the time of the storm.

- September 27, 2006 – Hutson received a call from White, who said he is a public adjuster representing the Jameses.

- October 17, 2006 – Hutson met with White and photographed the damages at the Garfield residence, "discussed personal property[,] and reviewed [White's] estimate." According to Hutson's report, "[i]nspection of the insured premises showed extensive damage to the front slope of the building" and "[s]cattered wind damage to the rear slope of the dwelling," but the interior damage was not as easily ascertainable because "all rooms except one had been stripped down to the studs." Hutson testified that at the time of inspection, "[i]nsulation, drywall, cabinets, flooring, floor coverings. . . [e]verything was missing." Hutson said he told White "[t]hat [Brush Country] would have difficulty getting [TWIA] to pay the interior of the claim."

- October 25, 2006 – Hutson advised TWIA that he was "in the process of preparing [the] estimate of damages" and informed TWIA that White presented an estimate in the amount of $89,930 for damages to the interior and exterior dwelling.

15

- October 26, 2006 – TWIA claims supervisor Gene Kounse sent Hutson the following fax message:

  I just read your status report and reviewed the photos. It appears that at your first inspection, the house had been gutted. Is this correct? Does the [public adjuster (PA)] have any photos of the interior prior to it being gutted? If not, you need to advise the PA we may have serious problems paying for the interior as we did not have an opportunity to inspect the damage. Advise the PA that the insured has done nothing to protect his property since the hurricane. The insured has stalled us for a year and now wants to be cooperative—and get his house remodeled? Send in your estimate, but don't make any guarantees. Call me if you have any questions.

- November 8, 2006 – Hutson contacted a TWIA representative to discuss damages owed.

- November 9, 2006 – Hutson prepared a claim estimate totaling $60,639.22.

- January 25, 2007 – Hutson received an email from TWIA instructing him to not share a copy of his estimate with the Jameses or White. TWIA informed Hutson that the Jameses' file had been discussed with Myers and Reggie Warren, TWIA Director of Claims, and TWIA would "send a check to the insured for the undisputed amount of this loss." The undisputed amount excluded any damage to the interior of the home.

- January 29, 2007 – TWIA closed out the Jameses' claim.

According to Myers, the Jameses were not ultimately paid Hutson's initial proposed estimate because TWIA determined "the coverage didn't exist." While Myers "agree[d] that elements went into the [Jameses'] home," he disagreed the home was damaged to the degree the Jameses claimed. "[W]ithout being able to physically look at it, there is no way for us to determine" the estimate of covered damages, said Myers.

Myers confirmed that Brush Country had not done work with TWIA since 2011, and against appellants' objections, the trial court admitted several emails into evidence dated 2008 and 2009, discussing claims unrelated to the appeal.

### 3. Patrick Mills

Patrick Mills, a TWIA claims examiner, testified as a TWIA representative at trial. Mills admitted that the claims process was not without error but maintained that TWIA never received communications from the Jameses regarding inventoried damages sustained to the Garfield home.

Mills also denied that TWIA tried to "bury" or "withh[o]ld" the estimate provided by claims adjuster Hutson. "We don't give adjuster reports in the normal course of business," said Mills.

When asked about "the resignation and/or termination" of two former TWIA employees, Warren and Bill Knarr, Mills stated he could not provide details but agreed that Warren was the "ultimate decision maker" on the Jameses' claim. Mills further confirmed that TWIA was placed on administrative oversight four years after the Jameses' claim—from 2011 until 2016.

On cross-examination, Mills denied that TWIA mismanaged the Jameses' claim or that the administrative oversight placement was relevant. He stated:

> [W]e've been entrusted with the money of our premium payers, the policyholders. And it's my job as the claims examiner or as the insurance company to monitor that money and release it when necessary. . . . If I don't get to see the property, I can't make those determinations. I can't fulfill my duty to monitor that process. I've got to see whether or not the building was damaged, whether or not it was damaged by a covered loss. We insure against wind and hail only. We don't insure against fire or mold. We don't insure against theft or vandalism, only wind and hail. . . . [O]ur policy is several pages long. All of those provisions need to be complied with. Otherwise, it's not a covered loss.

17

Mills maintained that the Jameses' loss was not covered because (1) TWIA was not able to examine the Garfield residence after the storm and prior to the Jameses' removal of the home's insulation, drywall, cabinets, flooring, and floor coverings, and (2) TWIA was unable to confirm that the Garfield property was, in fact, a "primary residence" as required under the policy.

## C.     Jury's Findings

The jury found as follows:

- TWIA failed to comply with the insurance policy with regard to dwelling, ALE, and personal property coverage;

- The Jameses provided TWIA access to the damaged property as often as TWIA reasonably required;

- The Jameses furnished TWIA "a complete inventory of damaged personal property showing the quantity, description, and amount of loss";

- The Jameses, however, "failed to keep and provide to TWIA pertinent records and documents and an accurate record of repair expenses";

- "TWIA [was] prejudiced by [the Jameses'] failure to keep and provide to TWIA pertinent records and documents and an accurate record of repair expenses";

- The Jameses' failure to comply with the insurance policy was not "excused because TWIA continued to perform under the contract and/or because TWIA demanded that [the Jameses] continue to perform under the contract";

- TWIA received all items, statements, and forms reasonably requested from the Jameses in order to secure a final proof of loss as to the Jameses' claim.

18

For TWIA's failure to comply with the insurance policy, the jury found the Jameses were entitled to the following damages: $33,000.00 for dwelling; $8,000.00 for ALE; and $10,000.00 for personal property.

As to violations of the insurance code, the jury additionally found that:

- TWIA, Brush Country, and Gutierrez engaged in an unfair or deceptive act or practice that caused damages to the Jameses by knowingly "[f]ailing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the liability under the insurance policy issued to David and Sue James had become reasonably clear"; and

- TWIA further failed "to provide promptly to David and Sue James a reasonable explanation of the factual and legal basis in the policy for the denial of a claim(s)" and refused "to pay a claim without conducting a reasonable investigation of the claim(s)."

For the Jameses' damages caused by these insurance code violations, the jury awarded the following damages: $33,000.00 for dwelling; $8,000.00 for ALE; and $10,000.00 for personal property.

The jury also awarded the Jameses $131,000.00 in reasonable and necessary attorneys' fees.

**D.    Post-Trial Motions**

On March 9, 2017, the Jameses filed a "Motion for Entry of Final Judgment on the Verdict," and on March 29, 2017, appellants filed a "Motion for Entry of Judgment or, Alternative, Motions to Disregard Jury Findings and for Entry of Judgment Notwithstanding the Verdict." On April 3, 2017, the Jameses filed a "Motion to Disregard

19

Jury Findings and Motion for Entry of Judgment Notwithstanding the Jury's Verdict." The trial court heard the parties' competing motions on April 3, 2017, and on April 4, 2017, it signed the Jameses' proposed Final Judgment, awarding all sums found by the jury[8] and disregarding the jury's answers to Question Nos. 4 and 5. On April 25, 2017, appellants filed a "Motion for New Trial or to Modify the Judgement," which was ultimately overruled by operation of law.

This appeal followed.

## II.    BREACH OF CONTRACT

Appellants' first three issues address the jury's breach of contract findings against TWIA. They contend the trial court erred by denying their motion for new trial, motion to modify the judgment, motion for judgment notwithstanding the verdict, and motion to disregard jury findings because: (1) the jury findings irreconcilably conflict; (2) there was no evidence to support the jury's findings on reasonable access, proof of loss, inventory of damaged property, or ALE; and (3) the loss sustained was not covered under the policy.

### A.    Standard of Review and Applicable Law

We review legal-sufficiency challenges to determine whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). "We will sustain a challenge to the legal sufficiency of the evidence if (1) there is a complete lack of evidence of a vital fact, (2) 'the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact,' (3) there is no more than a scintilla of evidence

---

[8] The trial court ordered that the Jameses recover "the sum of $295,785.89," an amount which included "all actual damages, reasonable and necessary attorneys' fees that were awarded, penalty interest, and the appropriate pre-judgment interest accrued to date."

20

offered to prove a vital fact, or (4) 'the evidence conclusively establishes the opposite of the vital fact.'" *Pike v. Tex. EMC Mgmt., LLC*, No. 17-0557, ___ S.W.3d ___, ___, 2020 WL 3405812, at *14 (Tex. June 19, 2020) (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "'When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019) (quoting *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015)). In our review, we are mindful that jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony, may choose to "believe one witness and disbelieve others," and "may resolve inconsistencies in the testimony of any witness." *In re E.I. duPont de Nemours & Co.*, 463 S.W.3d 80, 85 (Tex. App.—Beaumont 2015, orig. proceeding) (per curiam) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)); *see also City of Keller*, 168 S.W.3d at 820.

### 1. An Insurer's Breach

Insurance policies are contracts and, as such, are subject to rules applicable to contracts generally. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). To establish a breach of contract, a plaintiff must prove (1) the existence of a valid contract, (2) the plaintiff's performance or tender of performance, (3) the defendant's breach of contract, and (4) the plaintiff's damages as a result of the breach. *S&S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018); *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d

21

459, 468 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Certain Underwriters at Lloyd's v. KKM Inc.*, 215 S.W.3d 486, 489 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied)). In the context of an insurance policy breach of contract claim, a plaintiff must prove the existence of a valid insurance policy covering the denied claim[9] and entitlement to money damages on that claim. *Davis*, 484 S.W.3d at 468.

### 2. An Insured's Breach

Where, as here, an insurer argues the insured committed a material breach of the contract, thereby discharging or excusing it from further performance, such affirmative defense must be pleaded and proved by the insurer. *See* TEX. R. CIV. P. 94; *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). Whether a party's breach of a contract is material so as to render the contract unenforceable is generally a dispute for resolution by the trier of fact. *See Hutson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983). "[M]ateriality may be decided as a matter of law . . . if reasonable jurors could reach only one verdict." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam). "While a party's nonmaterial breach does not excuse further performance by the other party, neither does the second breach excuse the first." *Id.* at 437. In determining the materiality of an insured's breach, courts consider the extent to which the insurer will be deprived of the benefit it reasonably could have anticipated had the breach not occurred. *See Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex.

---

[9] A plaintiff also carries the burden of producing evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy. *Dall. Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 222–23 (Tex. App.—Dallas 2015, no pet.). When covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the covered peril. *Id.* at 222; *see Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971); *Tex. Windstorm Ins. Ass'n v. Dickinson Indep. Sch. Dist.*, 561 S.W.3d 263, 273 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("Although a plaintiff is not required to establish the amount of his damages with mathematical precision, there must be some reasonable basis upon which the jury's finding rests.").

1994); *see also Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 768 (Tex. 2014) ("If the insurer receives its reasonably anticipated benefit despite the insured's breach, the breach is immaterial, the insurer is not prejudiced, and the insurer is not excused from performance."). The less the insurer is deprived of the expected benefits, the less likely the breach is material. *See Hernandez*, 875 S.W.2d at 693.

## B. Conflicting Jury Answers

By their first issue, appellants argue that TWIA was not obligated to pay policy benefits because the Jameses materially breached their policy obligations. Specifically, TWIA contends that the trial court erred in disregarding the jury findings about the Jameses' prior material breach (Questions No. 4 and 5) because there is substantial evidence supporting the jury findings, and the findings themselves are material.

In this case, the Jameses' insurance policy stated:

a. Your Duties After Loss. In case of a loss to covered property caused by windstorm or hail, you must:

(1) Give prompt written notice to us of the facts relating to the claim,

(2) Protect the property from further damage.

(3) Make reasonable, necessary and temporary repairs to protect the property.

(4) Keep an accurate record of repair expenses.

(5) Furnish a complete inventory of damaged personal property showing the showing the quantity, description and amount of loss. Attach all bills, receipts and related documents which you have that justify the figures in the inventory.

(6) As often as we reasonably require:

(a) Provide us with access to the damaged property; . . .

23

(7)  Send to us, if we request, your signed sworn proof of loss within 91 days of our request on a standard form supplied by us. We must request a signed sworn proof of loss not later than the 15th day after we receive your written notice, or we waive our right to require a proof of loss. Such waiver will not waive our other rights under this policy.

The court's charge included questions on TWIA's affirmative defenses, challenging the Jameses' adherence to sections (a)(4), (5), and (6) of the policy. The jury found in favor of the Jameses with respect to sections (a)(5) and (6) (Questions No. 2 and 6), but found that the Jameses had failed to comply with the section (a)(4) duty to "keep and provide to TWIA pertinent records and documents and an accurate record of repair expenses" (Question No. 4), and that TWIA was "prejudiced by [the Jameses'] failure" (Question No. 5). The jury further found that the Jameses' aforementioned "failure to comply with the insurance policy" was not excused (Question No. 8). The jury also found that "TWIA receive[d] all items, statements, and forms reasonably requested from [the Jameses] in order to secure a final proof of loss" (Question No. 10). The trial court disregarded the jury's findings to Questions No. 4 and 5, resolving the matter against TWIA.

Here, the jury found that TWIA failed to comply with the policy regarding dwelling, ALE, and personal property coverage in its response to Question No. 1, while also finding that TWIA was prejudiced by the Jameses' failure to comply with the policy in its response to Questions No. 4 and 5. *See Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 695 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980)) ("The court must reconcile apparent conflicts in the jury's findings, if reasonably possible, in light of the pleadings and evidence, the

24

manner of submission, and the other findings considered as a whole."). Nevertheless, a trial court may "disregard any jury finding on a question that has no support in the evidence" upon reasonable notice or motion. TEX. R. CIV. P. 301. A trial court also may disregard a jury finding if it is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

In their motion for rendition of judgment, the Jameses argued that the jury's answers to Questions No. 4 and 5 should be disregarded because they are supported by insufficient evidence. Analyzing the extent to which TWIA was deprived of the benefit it reasonably could have anticipated from the Jameses' full performance—the materiality of their failure to fully perform their obligations under the policy—begins with analyzing their failure to perform; in other words, analyzing their breach. *See Greene*, 446 S.W.3d at 768. The Jameses do not challenge the jury's finding that they failed to furnish records of repairs; they instead assert that their failure was not a material breach of the policy. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008). We agree. Neither a reading of the policy[10] nor review of testimony admitted at trial would support a finding of materiality. *See id.*; *cf. Members Mut. Ins. Co. v. Cutaia*, 476 S.W.2d 278 (Tex. 1972)

---

[10] TWIA points to no language in the policy, and we find none, to support a finding that sections (a)(4), (5), and (6) of the "Duties After Loss" provision were conditions precedent to TWIA's obligations under the policy. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008) (holding that a policy subsection which was "entitled 'Duties in the Event of Occurrence, Claim or Suit' and speaks in terms of what the insured 'must do' if a claim is made against it" contains "language that more closely resembles a covenant," and thus, the insurer was excused from performance when the insured did not fulfill the duties).

(analyzing a policy which required the insured to forward any suit papers immediately to the insurer and explicitly provided that "'no action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy'").

Brush Country adjusters Gutierrez and Hutson both testified that there were several mechanisms available to the insurer to resolve a claim where the insured's property was damaged irreparably. Moreover, notwithstanding an absence of receipts, Hutson was able to generate an estimate of property repairs—just as the Jameses' two experts were. Applying the materiality principle to the facts of this case, we conclude that the Jameses' failure to "keep and provide to TWIA pertinent records and documents and an accurate record of repair expenses" was not a material breach as a matter of law. *See PAJ, Inc.*, 243 S.W.3d at 636; *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 382 (Tex. 2009); *Hernandez*, 875 S.W.2d at 693–94. Accordingly, the trial court did not err in disregarding the jury's answers to Questions No. 4 and 5, and instead, rendering judgment on Question No. 1.

We overrule issue one.

## C.     No Evidence Claims

Appellants next dispute TWIA's obligation to pay any additional policy benefits, arguing that the Jameses failed to comply with their duties under policy sections (a)(5), (6), and (7) to provide reasonable access, proof of loss, or an inventory of damaged property and ALE. Assuming without deciding that failure to comply with these specific duties would excuse TWIA's performance under the policy, we nonetheless conclude that

the Jameses provided sufficient evidence that they complied with those duties or that compliance was not required.

### 1. Access to Property

The Jameses maintained throughout the trial that they never refused TWIA access to the property. David spoke of one instance where Gutierrez appeared without warning on his property, and David, due to an existing medical issue, was unable to get out of bed. David granted Gutierrez permission to enter the premises unaccompanied, but Gutierrez declined. The Jameses also denied receiving several alleged communications from TWIA regarding requests for property access.

Conversely, TWIA asserts the Jameses' position is "plagued by a number of inconsistencies," that it does not comport with Gutierrez's uncontroverted testimony that he was only paid for homes he inspected and was therefore highly incentivized to inspect the home, and that the one instance described by David would be insufficient to fulfill the policy's requirement that access be made available "as often as [TWIA] reasonably require[d]."

Although there was evidence of attempted contact and refused access to property via company communication logs, there was also evidence that the aforementioned logs were not entirely accurate or reliable. We further observe that the jury was free to accept the Jameses' testimony as truth and disregard opposing testimony. *See City of Keller*, 168 S.W.3d at 820; *In re E.I. duPont de Nemours & Co.*, 463 S.W.3d at 85. We conclude there was more than a scintilla of evidence to support the jury's finding that the Jameses complied with their duty under policy section (a)(6) to provide TWIA with access to the property.

27

## 2. Proof of Loss

The Jameses concede they did not return the proof of loss form but contend that TWIA's failure to timely send the proof of loss form constituted a waiver under the policy.

Under the policy, the Jameses were required to submit a "signed sworn proof of loss within 91 days of [TWIA's] request on a standard form supplied by [TWIA]." The policy also stipulated that TWIA would "waive its right to require a proof of loss" if it failed to "request a signed sworn proof of loss not later than the 15th day after it receive[d] [the Jameses'] written notice." Neither party disputes that the Jameses submitted a written notice of claim on September 29, 2005. However, TWIA has not pointed us to an earlier supplied proof of loss form, and we find no evidence of said form sent within the required time frame.[11] Thus, under the policy, the Jameses were not required to return the sworn proof of loss, and our analysis concludes in favor of the Jameses. *See Menchaca*, 545 S.W.3d at 488.

## 3. Inventory of Damages

The Jameses testified that the damaged personal property amounted to approximately $20,000 and that Sue had mailed TWIA a written inventory of damaged personal property, accompanied by printed and digitally saved photographs. TWIA asserts it never received an inventory of damages but acquiesced to the suggestion that errors do happen while sending and receiving communications.[12] Again, the jury was free

---

[11] TWIA acknowledges in its brief that "Gutierrez provided the proof of loss form in his December 7, 2005 letter." The letter stated in part: "It is your duty after the loss to file a Proof of Loss within 91 days of our request. . . . Attached is a blank Proof of Loss form for you to use. . ."

[12] One letter addressed to the Jameses from TWIA and admitted into evidence makes specific reference to the Garfield residence, the Jameses, their correct claim number, and policy number. The letter, however, also erroneously discusses a "rental home" in Corpus Christi and describes a leaking chimney with mold growth; the Garfield property is located in Groves, Texas, and is without a chimney.

to "believe one witness and disbelieve others." *In re E.I. duPont de Nemours & Co.*, 463 S.W.3d at 85 (citing *McGalliard*, 722 S.W.2d at 697 (Tex. 1986)). Thus, there was more than a scintilla of evidence supporting the jury's finding that the Jameses complied with section (a)(5) of the policy, and TWIA's no evidence challenge fails. *See City of Keller*, 168 S.W.3d at 820; *In re E.I. duPont de Nemours & Co.*, 463 S.W.3d at 85.

### 4. ALE

In a provision entitled "Extensions of Coverage," the policy details the following ALE coverage:

> If a loss caused by windstorm or hail makes the described location wholly or partially untenantable, we cover additional living expense, meaning any necessary and reasonable increase in living expense you incur so that your household can maintain its normal standard of living.
>
> The total limit of liability for all additional living expense is 20% of the limit of liability applicable to Coverage A (Dwelling). This is additional insurance and does not reduce the limit of liability applicable to Coverage A (Dwelling), but the total limit of liability for the Coverage A (Dwelling) limit and the additional living expense limit cannot exceed the maximum limit of liability permitted by law. The deductible does not apply to additional living expense coverage.
>
> Payment will be for the reasonable time required to repair or replace the damaged property. If you permanently relocate, payment will be for the reasonable time required for your household to become settled. The periods of time for additional living expense are not limited by expiration of this policy.

As discussed *supra*, evidence was presented to support a finding that the residence was uninhabitable after the hurricane. Moreover, evidence indicated TWIA was aware that the home was unlivable and that the Jameses had incurred ALE in the form of hotel stays and a purchased trailer priced at $30,000. [13] Hutson's notes to TWIA

---

[13] Gutierrez's notes indicated that David had been advised by his physician to move out of the Garfield dwelling, and that David had to reschedule an inspection of the Garfield home because he had an appointment to purchase a mobile home.

29

acknowledge as much: "[i]nsured has incurred ALE expenses [sic] but none has been presented at the present time. There is a trailer parked in the driveway." While there is no indication that the Jameses tendered any receipts for ALE reimbursement, there is likewise no indication that TWIA requested that the Jameses do so, and the contract is silent on what was required for the fulfillment of an ALE claim. In any matter, where the appellant asserts a "no evidence" challenge, and there was, in fact, evidence offered to prove a vital fact, appellees have met their burden. *See Lopez*, 576 S.W.3d at 397.

We overrule issue two.

**D.    Covered Loss**

TWIA next asserts the Jameses "never offered any evidence of the portion of the damage caused solely by the covered peril," and therefore no evidence supports the damages found by the jury. More specifically, TWIA argues that the Jameses, in leaving the residence open to rain and moisture, caused the damage for which they now seek compensation.

The policy afforded the Jameses the following coverage: "[TWIA] will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. . . . We cover direct physical loss to the covered property caused by windstorm or hail unless the loss is excluded in the Exclusions." The policy excluded losses caused by "Flood," "Power Failure," "Electricity," "Mold, Fungi, or Other Microorganisms," among others. Losses caused by "Rain" are also excluded "unless direct force of wind or hail makes an opening in a roof or wall and rain enters through this opening and causes the damage."

Following the hurricane, multiple witnesses observed serious exterior and interior damage to the home. Bedair testified he observed damage to the roof and front and back doors. Caldwell echoed Bedair's statements, adding that the home was in "absolute shambles," with the "whole inside of the house just being literally torn all to pieces." The Jameses testified that by the time they viewed their home, the interior walls were wet, the home smelled of mold, and sun beams could be seen entering through the cracks in the ceiling.

While TWIA claims the Jameses left the home "open to the rain and elements for nearly two years," the Jameses presented evidence that the doors were shut as soon as reasonably feasible—once evacuation orders had been lifted and residents were permitted to return. There was also undisputed evidence that the Jameses placed a tarp over the roof as a preventative measure as well.

Perhaps most notably, the Jameses' engineering expert testified that the home, which had sustained ninety- to one-hundred-mile-per-hour winds and significant rainfall from the hurricane, had become permanently damaged within seventy-two hours of permeation. The jury was entitled to credit this testimony and to reject evidence to the contrary. *See In re E.I. duPont de Nemours & Co.*, 463 S.W.3d at 85. Viewed in the light most favorable to the jury's verdict, this evidence would enable a rational jury to conclude that wind and rain entering through an opening first caused by wind was the sole cause of the Jameses' loss requiring replacement. *See Davis*, 484 S.W.3d at 472 (deferring to the jury's resolution of conflicting testimony on the nature of a loss).

We overrule issue three.[14]

---

[14] In finding in favor of the Jameses, we need not address TWIA's next argument, which is contingent on a finding that the Jameses' loss was not covered. *See USAA Tex. Lloyds Co. v. Menchaca*,

## III.    EXTRA-CONTRACTUAL CLAIMS

By its fourth issue, appellants argue that the Jameses' extra-contractual claims must fail. Four allegations of violations of Chapter 541 of the Texas Insurance Code[15] were submitted to the jury (Question No. 12). The Jameses alleged the appellants: (1) failed to make a good faith attempt to effectuate a prompt, fair, and equitable settlement pursuant to Texas Insurance Code § 541.060(a)(2); (2) failed to provide adequate explanation pursuant to § 541.060(a)(3); (3) refused "to pay on a claim without conducting a reasonable investigation" pursuant § 541.060(a)(7); and (4) "misrepresent[ed] to a claimant a material fact or policy provision relating to coverage at issue" pursuant to § 541.060(a)(1). The jury found that all three appellants had violated Texas Insurance Code § 541.060(a)(2), and that TWIA had also violated §§ 541.060(a)(3) and (a)(7).

---

545 S.W.3d 479, 489, 491 (Tex. 2018) ("An insured's claim for breach of an insurance contract is 'distinct' and 'independent' from claims that the insurer violated its extra-contractual common-law and statutory duties. . . . [W]hen the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive.").

[15] The Texas Insurance Code prohibits insurers from engaging in enumerated "unfair settlement practices with respect to a claim" by an insured under an insurance policy. *See* TEX. INS. CODE ANN. § 541.060(a). Relevant here, § 541.060(a) provides:

It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary

(1) misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue;

(2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear;

. . .

(3) failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim; [or]

. . .

(7) refusing to pay a claim without conducting a reasonable investigation with respect to the claim[.]

*Id.*

Appellants assert there was no evidence to find liability under any of the three sections, and alternatively, evidence is factually insufficient to support liability and damages under the insurance code.

## A.    Good Faith Attempt to Effectuate a Prompt, Fair, and Equitable Settlement

An insurer does not breach its duty of good faith merely by erroneously denying a claim. *See Certain Underwriters at Lloyd's, London v. Prime Nat. Res., Inc.*, No. 01-17-00881-CV, ___ S.W.3d ___, ___, 2019 WL 7044667, at *16 (Tex. App.—Houston [1st Dist.] Nov. 26, 2019, no pet.). And, evidence showing only a bona fide coverage dispute, by itself, does not demonstrate bad faith. *Id.*; *see Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 67 (Tex. 1997) ("[A] simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith."). An insurer violates its duty of good faith and fair dealing only when it has no reasonable basis for the denial or delay in payment of the insured's claim and the insurer knows or should have known of that fact. *See Davis*, 484 S.W.3d at 473. Whether an insurer failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim after its liability became reasonably clear is a question for the factfinder. *Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 569 (Tex. App.—San Antonio 2011, pet. denied) (citing *Giles*, 950 S.W.2d at 56).

### 1.    Gutierrez[16]

Gutierrez was the adjuster assigned to the Jameses' claim for a period of approximately sixty days. During the first thirty days, Gutierrez attempted to but was

---

[16] The conduct of a person acting as an insurance adjuster may violate chapter 541 of the insurance code. *See* TEX. INS. CODE ANN. § 541.002 (defining "person" as including an adjuster); *Gasch v. Hartford Accident & Indem. Co.*, 491 F.3d 278, 283 (5th Cir. 2007); *Liberty Mut. Ins. Co. v. Garrison*

unable to communicate with the Jameses as they had been physically displaced following the hurricane. And, by the time of Gutierrez's departure from the case thirty days later, TWIA's prescribed deadline had not yet passed for the Jameses to submit a proof of loss form,[17] Gutierrez had not been able to arrange a time to view the home despite multiple recognized attempts by all parties, and a dispute still existed over the extent of the loss incurred. Though the Jameses blame Gutierrez for failing to inspect the property, in asserting such argument, they accept that TWIA's ability to resolve the claim was contingent on it viewing the property—i.e., a coverage dispute existed, and the viewing of the property was a reasonable basis for delaying the resolution of the claim. *See JM Walker LLC v. Acadia Ins. Co.*, 356 Fed. Appx. 744, 747 (5th Cir. 2009) ("[T]he insured must show that the insurer had no reasonable basis for denying or delaying payment of the claim."). In other words, the Jameses do not point to any evidence, and we find none, that at the time of his withdrawal from the claims investigation, Gutierrez lacked a reasonably clear basis for denying or delaying payment of the Jameses' claim. *See Menchaca*, 545 S.W.3d at 497; *Aleman v. Zenith Ins. Co.*, 343 S.W.3d 817, 823–24 (Tex. App.—El Paso 2011, no pet.) ("Whether liability is reasonably clear must be judged by the facts before the insurer at the time it denied the claim." (citing *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990))). Even taking into account the one instance where the Jameses claim Gutierrez arrived unexpectedly and declined to view the property unaccompanied by the homeowner, such singular occurrence, without more, does not rise to legally sufficient evidence of "bad faith." *See City of Keller*, 168 S.W.3d

---

*Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998); *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 622 (Tex. App.—Fort Worth 2017, pet. denied).

[17] The proof of loss form sent to the Jameses on December 7, 2005, provided for a return date of January 2, 2006.

at 810; *Giles*, 950 S.W.2d at 67; *see also State Farm Lloyds v. Webb*, No. 09-15-00408-CV, 2017 WL 1739763, at *9 (Tex. App.—Beaumont May 4, 2017, pet. denied) (mem. op.).

Having determined that the evidence is legally insufficient to support the Jameses' recovery against Gutierrez on their insurance code claim, we need not address appellant's argument that the evidence is factually insufficient. *See* TEX. R. APP. P. 47.1. We sustain appellants' fourth issue as it pertains to Gutierrez and reverse that portion of the trial court's judgment awarding the Jameses a recovery on extra-contractual claims against Gutierrez.

### 2. Brush Country and TWIA

Brush Country and TWIA argue the Jameses' "failure to comply with multiple conditions precedent," which resulted in "destruction of the evidence" and the existing "difference in opinion as to the cause of the alleged damage," prevented coverage from becoming reasonably clear sooner than the January 2007 claim closure date. Brush Country and TWIA cite three cases in support of their proposition, two of which involve evidence that, at most, established a coverage dispute. *See Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 194 (Tex. 1998); *Giles*, 950 S.W.2d at 57; *Richardson E. Baptist Church v. Phila. Indem. Ins. Co.*, No. 05-14-01491-CV, 2016 WL 1242480, at *8 (Tex. App.—Dallas Mar. 30, 2016, pet. denied) (mem. op.).

In *Castaneda*, the insurer "gave varying reasons for denying" the insured's claim, "but all were grounded in a common nucleus of facts"—including policy provisions excluding coverage for enumerated reasons—and "at least one [insurer] employee thought that the claim also could have been denied based on the pre-existing condition

35

provision of the policy." *Castaneda*, 988 S.W.2d at 193. The court held "considering all the facts in existence at the time of the denial, there is no evidence that there was no reasonable basis for [the insurer's] denial of [the insured's] claim . . . or that liability had become reasonably clear," because "evidence of a coverage dispute is not evidence that liability under the policy had become reasonably clear." *Id.* at 193–94.

The Dallas appellate court reasoned similarly in *Philadelphia Indemnity*. 2016 WL 1242480, at *8. The court acknowledged that the only policy dispute was "whether certain parts of the roof were damaged by hail" and was, thus, a covered loss. *Id.* The court noted that the parties each obtained experts prior to the claim's denial, and the experts provided conflicting opinions. *Id.* The court concluded that because the insured "did not present any evidence that [the insurer's expert's] estimates of the hail damage were 'unreliable or not objectively prepared[,]'" the insurer's delay in the denial of the claim based on said report did not give rise to extra-contractual liability. *Id.* (quoting *Castaneda,* 988 S.W.2d at 194).

By contrast, *Giles* held there was *some* evidence to support a finding of bad faith where coverage of the claim became reasonably clear as soon as the insurer received the insured's medical records, and yet, the insurer continued to deny coverage for several additional months. *Giles*, 950 S.W.2d at 57. Based on these facts, "[t]he jury could have logically concluded that [the insurer] denied Giles's claim without a reasonable basis and that its purported reliance on Giles's medical records was a mere pretext." *See id.*

The facts presented here are more akin to the facts before the Texas Supreme Court in *Giles. See id*.; *cf. Castaneda*, 988 S.W.2d at 193. For reasons disputed by the

parties,[18] the first and only property inspection occurred on October 25, 2006, over one year after the hurricane. Even assuming, in contravention to what the Jameses claim, that Gutierrez never visited the property in late 2005, Grossman was at the Jameses residence on February 2006, and four months later so was Hutson, for reasons unexplained, Hutson was the first adjuster to take photographs or document the property's exterior. In the nine months which preceded, no other adjuster had done so. Brush Country's notes indicate it was aware that the exterior property had sustained extensive damage because of the storm, and the October inspection confirmed as much. Regardless of the cause for delay, by the time of Brush Country's inspection in October, there existed no coverage dispute regarding the property's exterior damage, and yet, the Jameses' claim remained unresolved until late January 2007. *See Menchaca*, 545 S.W.3d at 497; *Giles*, 950 S.W.2d at 57; *Davis*, 484 S.W.3d at 473.

Regarding the interior damages, following inspection, Brush Country notified TWIA that all but one room in the interior dwelling had been "stripped down to the studs," that the Jameses' public adjuster valued total repairs at $89,930.45, and that the Brush Country adjuster's estimate of repairs would follow. TWIA responded the next day, instructing the Brush Country adjuster to "advise the [the Jameses' public adjuster] we may have serious problems paying for the interior as we did not have an opportunity to inspect the damage." TWIA instructed Brush Country to "[s]end in [its] estimate, but don't make any guarantees." On November 10, 2006, Brush Country submitted its repair cost estimate of $60,639.22, which included estimated interior repairs and accounted for

---

[18] As discussed *infra*, appellants argue that the Jameses were uncooperative and prohibited them from viewing the property prior to October 2006. The Jameses maintain that they never precluded appellants from inspecting the property and challenge the number of attempted contacts purportedly made by appellants to inspect the property.

37

depreciation. This estimate was not disclosed to the Jameses. Two months later, TWIA sent an email to Brush Country to verify that it had not sent the original $60,639.22 estimate to the Jameses and ordered a revised estimate for exterior only repairs. *See* TEX. INS. CODE ANN. § 542.056. On January 26, 2007, Brush Country produced an adjusted estimate of $13,650.81. Three days later, TWIA sent a letter to the Jameses denying their claim in part and submitting payment for only exterior dwelling repairs; attached to the letter was Brush Country's second estimate, estimating repairs at $13,650.81.

While evidence that shows an insurer was incorrect about the factual basis for its denial of the claim is not evidence of bad faith, the complete disregard of a reliable estimate may be. *See Menchaca*, 545 S.W.3d at 497; *Giles*, 950 S.W.2d at 51 ("[U]nder our no-evidence standard of review, an appellate court must resolve all conflicts in the evidence and draw all inferences in favor of a bad-faith finding."); *Cantu*, 399 S.W.3d at 570; *see also Webb*, 2017 WL 1739763, at *9. TWIA does not allege that Brush Country's original estimate was unreliable, nor does TWIA put forth an expert report—or any evidence—challenging the Jameses' reported interior loss as loss not caused by covered peril. *Cf. Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993) (holding that the insurer could deny the insured's "claim without exposing itself to a bad faith judgment if it reasonably relied on expert reports indicating her loss was not caused by a covered peril, even though its liability on the insurance policy was ultimately established"). TWIA instead argues that it refused to pay for damages to the interior dwelling because an adjuster had not viewed the reported damages prior to any alterations to the

property.[19] TWIA's specified rational, however, exists in contravention of its decision to reject coverage for the portion of the interior dwelling that its own adjuster noted was unaltered and included in the original estimate (but excluded in the revised estimate). A plain assertion by the insurer, without more, cannot constitute evidence of loss not caused by a covered peril. *See Menchaca*, 545 S.W.3d at 497; *Giles*, 950 S.W.2d at 57; *see also Webb*, 2017 WL 1739763, at *9.

Applying the traditional standard of no-evidence review, we conclude that TWIA's claimed reliance on its own adjuster's report before resolving the claim was mere pretext for unnecessarily delaying and then denying the claim several months later and that some evidence supports the jury's finding that TWIA was liable under § 541.060(a)(2). *See* TEX. INS. CODE ANN. § 541.060(a)(2); *Giles*, 950 S.W.2d at 57.

We overrule issue four with respect to TWIA.

We, however, cannot conclude such liability extended to Brush Country, which produced an unchallenged estimate,[20] and whose ability to resolve the claim was contingent on TWIA's approval of said claim estimate. The evidence was legally and factually insufficient to establish that Brush Country was liable under § 541.060(a)(2). We sustain appellants' fourth issue as it pertains to Brush Country and reverse that portion of

---

[19] TWIA's letter to the Jameses denying coverage included the following explanation: "Your estimate for the damages includes items that were removed prior to our inspection. Removal of the ceilings, walls, and floor coverings has impeded our investigation for evidence of a covered loss. For this reason[,] we must reject your estimate, and refuse further payment for these items."

The Jameses testified, and their experts concurred, that the extensive damage to the exterior caused by the storm left the interior susceptible to continued damage and required immediate removal.

[20] At trial, the jury was privy to three estimates: (1) that of Gutier, the Jameses' expert, who based his estimate on his own inspection of the Garfield residence two years after the hurricane and the inspection report conducted by another expert ($119,000), (2) that of White, the Jameses' public adjuster ($89,930), and (3) that of Brush County ($60,639). Gutier acknowledged that his cost estimate did not account for depreciation and deductibles as required under the insurance policy, and opined that TWIA's adjuster estimate was "good," citing to no particular issues with the estimate or accompanying report.

the trial court's judgment awarding the Jameses a recovery on extra-contractual claims against Brush Country.[21]

## B.      Failure to Promptly Explain the Reasons for the Denial

By its fifth issue, TWIA argues that there is no evidence that it failed to promptly provide a reasonable explanation for the claim denial. *See id.* § 541.060(a)(3) (requiring an insurer to "to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim").

On January 29, 2007, TWIA mailed the Jameses the following letter:

> Enclosed is a check and a copy of the adjuster's estimate. This payment is the for portion of the reopened loss, we are able to verify was caused by windstorm.
>
> The [TWIA] policy only covers loss that is the direct result of windstorm or hail. Our investigation has revealed that a large portion of the dwelling interior was removed prior to our inspection.
>
> Your estimate for the damages includes items that were moved prior to our inspection. Removal of the ceilings, walls, and floor coverings has impeded our investigation for evidence of covered loss. For this reason, we must reject your estimate, and refuse further payment for these items.
>
> . . .
>
> Our position is: we have paid for the portion of this loss we are able to verify were the direct result of windstorm. Due to the commencement of repairs and the delay in allowing us to inspect the property, we cannot determine what, if any, of the amounts you are claiming are the direct result of windstorm.
>
> We will carefully consider any other information or evidence you have that supports you have an additional covered loss under your TWIA policy. Please forward that information to us.

The remainder of the letter speaks to the appeals process.

---

[21] Having found in favor of Gutierrez and Brush Country on issue four, we need not reach appellants' issue seventeen. *See* TEX. R. APP. P. 47.1.

40

TWIA argues that this letter presents a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, of its offer. TWIA provides no comment on the promptness requirement of the statute.

As discussed above, TWIA stipulates in its letter to the Jameses that "a *large portion* of the dwelling interior was removed prior to [its] inspection," thereby conceding the entire premises had not been altered. However, TWIA does not provide explanation for its rejection of the portion of the interior dwelling which remained intact, and such decision does not comport with TWIA's claim that its rejection was premised on the Jameses' "[r]emoval of the ceilings, walls, and floor coverings." Assuming, without deciding, that such letter nonetheless constitutes a "reasonable explanation," *see, e.g.*, *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 795 F. Supp. 2d 493, 534–35 (N.D. Tex. 2011), *aff'd*, 709 F.3d 515 (5th Cir. 2013), the letter was not sent "promptly" to the Jameses. *See* TEX. INS. CODE ANN. § 542.056.

Evidence at trial indicates that TWIA reached its decision to reject a portion of the claim, for reasons articulated in its January 2007 letter to the Jameses, months prior in 2006. *See id.* (providing that "an insurer shall notify a claimant in writing of the acceptance or *rejection* of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss") (emphasis added). At trial, the trial court admitted into evidence a check from TWIA for the amount of $553.56[22] "for accrued penalties and interest for [the] alleged late payment for covered damages found by TWIA in January 2007 based upon the enclosed calculations." *See id.* In a letter accompanying the check, TWIA provided that "[it] had

---

[22] The check, made payable to "David James and The Mostyn Law Firm," also included $5,000.00 for attorney's fees.

everything it needed the day its [insurance adjuster] calc[ulated] his first estimate," and thus, the calculated penalty payment ran "from the date a claim decision was required," which TWIA surmised was December 17, 2006. TWIA resolved that it had issued its claims decision forty-three days late. *See id.*

Applying the traditional standard of no-evidence review, we conclude that some evidence supports the jury's finding that TWIA was liable under § 541.060(a)(3). *See* TEX. INS. CODE ANN. § 541.060(a)(3).

We overrule issue five.

## C.    Denial of the Jameses' Claim Without a Reasonable Investigation

TWIA next asserts that there is no evidence that it "refus[ed] to pay a claim without conducting a reasonable investigation with respect to the claim." *Id.* § 541.060(a)(7).

"The 'special relationship' between the insured and insurer imposes on the insurer a duty to investigate claims thoroughly and in good faith, and to deny those claims only after an investigation reveals there is a reasonable basis to do so." *Viles*, 788 S.W.2d at 568; *see Menchaca*, 545 S.W.3d at 495. The Jameses offered the following evidence of an unreasonable investigation at trial: (1) TWIA failed to timely submit a proof of loss form and still demanded return of said form, which had pre-typed zeros in the column signifying the amount of the Jameses' total reported loss—thereby potentially divesting the Jameses the opportunity to recoup actual losses; (2) although TWIA had the permission from the Jameses to inspect the dwelling unaccompanied, TWIA, through its adjusters, declined; (3) TWIA, through its adjusters, waited until June 2006, nearly nine months after the hurricane, to photograph and document the exterior condition of the dwelling notwithstanding that adjusters had visited the Garfield property on at least two prior

42

occasions; (4) TWIA was aware of and notated evidence of the Jameses' ALE, yet never requested that the Jameses provide ALE-related documentation; (5) TWIA declined to request that the Jameses submit to an examination under oath in support of their claims, an option provided under the policy, despite having concerns regarding policy coverage; (6) TWIA disregarded its own adjuster's submitted estimate, including for damages sustained in portions of the residence that had not been "gutted," and provided no expert-based opinion as to the reason for its departure from the estimate; and (7) TWIA issued its notice of claim disposition forty-three days late. Applying the traditional standard of no-evidence review, we conclude that some evidence supports the jury's finding that TWIA was liable under § 541.060(a)(7). *See* TEX. INS. CODE ANN. § 541.060(a)(7).

We overrule issue six.

## D.    Factual Sufficiency

In a factual sufficiency review, we consider and weigh all of the evidence, and we will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 822; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

We have already concluded that the evidence was legally sufficient to support TWIA's liability under § 541.060(a)(2), and we further conclude the evidence was factually sufficient to support that finding. *See City of Keller*, 168 S.W.3d at 822.

We overrule issue seven.

## IV.    ATTORNEY'S FEES

In issues eight through ten, appellants contend that the trial court abused its discretion in awarding the Jameses' attorney's fees because (1) the fees were not shown

to be reasonable and necessary; (2) the Jameses failed to segregate recoverable from unrecoverable fees; and (3) the pre-suit demand letter was excessive under the law.

## A.     Reasonable and Necessary Attorney's Fees

We review a trial court's judgment awarding attorneys' fees for an abuse of discretion. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018); *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004); *see also Nat'l Sec. Fire & Cas. Co. v. Lampson*, No. 09-15-00299-CV, 2016 WL 7018302, at *14 (Tex. App.—Beaumont Dec. 1, 2016, pet. denied) (mem. op.).

"As a general rule, the party seeking to recover attorney's fees carries the burden of proof." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). Under the insurance code, an award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. TEX. INS. CODE ANN. § 541.142(a)(1); *see Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 502 (Tex. 2019) ("When fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees."); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

The Supreme Court of Texas has set forth a list of eight factors that the factfinder should consider when determining the reasonableness of attorney's fees. *Arthur Andersen*, 945 S.W.2d at 818; *Webb v. Crawley*, 590 S.W.3d 570, 579 (Tex. App.—Beaumont 2019, no pet.). Those factors are:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)     the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

44

(2)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id*. A party need not prove all of the *Arthur Andersen* factors for the evidence supporting an attorney's fee award to be sufficient. *See City of Keller*, 168 S.W.3d at 810; *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.); *see also Shouldice v. Van Hamersveld*, No. 09-18-00355-CV, 2020 WL 370438, at *6 (Tex. App.—Beaumont Jan. 23, 2020, no pet.) (mem. op.).

By their eighth issue, appellants assert that the Jameses' evidence was legally insufficient to prove each *Arthur Andersen* factor. The Jameses' attorney's fees expert witness, Randy Cashiola, an attorney practicing in the Beaumont area since 1989, testified that the rates charged per hour by the Jameses' attorneys in this case were reasonable, reflective of the risk of taking the case, and commensurate with the attorneys' skills. Cashiola explained that the rates did not exceed the state-wide or Beaumont-area rates and were reasonable given the niche area of insurance law. Cashiola further testified that the Jameses' attorneys were working on a contingency basis and "there is no guarantee here of any kind of recovery"; thus, the attorneys had been incentivized to keep costs low and did so by apportioning many assignments to associate-level attorneys and legal assistants.

45

Cashiola pointed to the itemized fee report that the Jameses' attorneys created; the spreadsheet reflected their work for the ten years preceding trial. Total attorney's fees amounted to $103,175. Cashiola cautioned, however, that total attorney's fees would exceed the amount indicated on the spreadsheet, as the spreadsheet did not reflect that the Jameses' attorneys had spent and would continue to spend an excess of ten to twelve hours per day when in trial. The proposed attorney's fee total also did not account for appellate attorney's fees. Cashiola testified that a reasonable amount of conditional appellate attorney's fees would be $50,000 for proceedings in the court of appeals and $35,000 for proceedings in the Texas Supreme Court. Cashiola said he derived his estimate of reasonable appellate attorney's fees based upon an hourly rate of $500. Cashiola concluded, "[T]hese are reasonable rates under all the factors of *Arthur Andersen* and all of the evidence that I've reviewed of other rates of other lawyers in cases such as these throughout the state." Cashiola also noted that the Jameses' attorney's fees remained less than the amount incurred by appellants' attorneys.

The spreadsheet Cashiola repeatedly referenced was admitted into evidence. The spreadsheet lists the services performed, who performed them, the hourly rate for the services, when they were performed, and how much time the work required. The jury ultimately awarded attorney's fees of $131,000 for representation at trial, $50,000 for representation before the court of appeals, and $35,000 for an appeal to the Texas Supreme Court.

The fees in this case reflect nearly a decade of work, including numerous depositions and proceedings, document drafting and review, and trial preparation, and do

46

not appear excessive.[23] *See Day v. Fed'n of State Med. Boards of the U.S., Inc.*, 579 S.W.3d 810, 827 (Tex. App.—San Antonio 2019, pet. denied) (affirming award for attorney's fees in the amount of $83,292.50 in a suit resolved prior to trial); *Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 209–10 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding attorney's fee award of over $282,000 was supported by legally and factually sufficient evidence although it was two times more than actual damages recovered); *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 285 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (finding attorney's fee sum of $168,582.50 not excessive where case spanned three years and trial lasted full five weeks); *see also Nat'l Lloyds Ins. Co. v. Lewis*, No. 09-13-00413-CV, 2015 WL 690807, at *13 (Tex. App.—Beaumont Feb. 19, 2015, pet. denied) (mem. op.) (affirming as modified an award for attorney's fees in the amount of $300,000 in suit for an unpaid Hurricane Rita policy claim); *Zaid v. Weingarten Realty Inv'rs*, No. 09-10-00225-CV, 2011 WL 3847379, at *4 (Tex. App.—Beaumont Aug. 31, 2011, no pet.) (mem. op.) (affirming jury award for attorney's fees: $46,971.50 for trial, $30,000 for an appeal to the court of appeals, and $30,000 for an appeal to the Texas Supreme Court). On this record, we conclude that the evidence was legally sufficient to support the attorney's fees awarded. *See Pike*, ___ S.W.3d. at ___, 2020 WL 3405812, at *14; *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) (holding testimony "regarding legal services rendered and various

---

[23] Appellants appear to additionally argue that the trial court erred in disallowing appellants from adequately "challenging the necessity of the fees" when it (1) excluded evidence of the previous case dismissal for want of prosecution and (2) prevented appellants "from exploring the number of lawsuits [Jameses' counsel's] firm filed against TWIA following Hurricanes Rita and Ike." Appellants cite no authority in support of these contentions, and to the extent that appellant seeks to raise these additional points of error, they are waived. *See* TEX. R. APP. P. 38.1(i); *Lowry v. Tarbox*, 537 S.W.3d 599, 619 (Tex. App.—San Antonio 2017, pet. denied).

work performed through trial, each attorney's related experience, and what factors each considered to determine a reasonable fee" constitutes a "quantum of evidence found sufficient" to support a claim for attorney's fees).

Accordingly, we overrule issue eight.

## B.    Segregation of Fees[24]

By their ninth issue, appellants argue the Jameses failed to segregate their attorney's fees between collectable and non-collectable causes of action, and alternatively, they failed to present evidence that the causes of action were so interrelated that their prosecution entailed proof of the same facts, which would negate the requirement to segregate.

Where applicable, the prevailing party is required to segregate work relating to recoverable and non-recoverable claims to recover attorney's fees. *Kinsel*, 526 S.W.3d at 427 (citing *Chapa*, 212 S.W.3d at 314). An exception to the segregation rule exists only when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible. *Chapa*, 212 S.W.3d at 313. But "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14; *see A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007). "For example, to prevail on a contract claim[,] a party must overcome any and all affirmative

---

[24] The Jameses assert appellants' ninth issue is waived because appellants "made no relevant objection when the evidence was presented or when the question was submitted to the jury." The reporter's record indicates otherwise. Appellants' counsel objected during the charge conference, arguing in part:

> there's no evidence to support the submission of attorneys' fees and there's no evidence on which a reasonable juror could base his or her decision awarding attorneys' fees in this case. We also object to the failure to segregate attorneys' fees between covered and noncovered claims and would argue that the 5 percent segregation was not adequately explained or supported by any evidence in the case.

48

defenses (such as limitations, res judicata, or prior material breach), and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those defenses was unnecessary." *Chapa*, 212 S.W.3d at 314. "[S]egregation is sufficiently established if an attorney testifies that a given percentage of the time worked would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted." *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 490 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The need to segregate fees is a "mixed question of law and fact for the jury." *Chapa*, 212 S.W.3d at 313.

Here, the Jameses brought a statutory claim, for which the recovery of fees is authorized, and a common law contractual claim, for which it is not. Cashiola opined "that 5 percent is more than enough to remove from this fee to account for the common law cause of action." Cashiola maintained he reached his conclusion following an analysis of the record, and said conclusion was in abidance with the Texas Supreme Court's recommendation. *See State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 103 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (upholding an attorney's fee award where the attorney proved fee segregation by testifying that he estimated five percent of the attorney's fees were attributable to non-recoverable work); *Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 929–30 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (upholding an attorney's fee award where attorney testified at least 90% of work "was work that either directly related to defending . . . the non-compete claim or was so intertwined that it could not be separated"); *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l. Corp.*, 418 S.W.3d 172, 202 (Tex. App.—Dallas 2013, pet. denied) (upholding an attorney's fee award where expert testified 85% or $127,073 of attorney's

49

fees "[were] recoverable against the [d]efendants in th[e] lawsuit," "it [was] reasonable to conclude that [plaintiff's] counsel's activities c[ould not] all be segregated by task and as such [were] dependent on the same or similar set of facts and circumstances," and attorney's fees were "therefore so intertwined that they c[ould not] be so separated or segregated" (internal quotations omitted)); *cf. United Servs. Auto. Ass'n v. Hayes*, 507 S.W.3d 263, 285 (Tex. App.—Houston [1st Dist.] 2016, pet. granted, judgm't vacated w.r.m.) (concluding that Cashiola's testimony regarding a five percent reduction was insufficient where he "did not demonstrate that he took into account any of the actual work performed or the claims made in the . . . case").

We overrule issue nine.

## C.    Pre-Suit Demand

We next address appellants' argument that the trial court erred by awarding attorney's fees in its judgment because the Jameses made an excessive pre-suit demand.

Generally, a "creditor who makes an excessive demand upon a debtor is not entitled to attorney's fees for subsequent litigation required to recover the debt," even if it prevails in its suit. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981). A claim of excessive pre-suit demand is an affirmative defense to an award of attorney's fees and must be pleaded or tried by consent. *Hayes*, 507 S.W.3d at 280; *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 209 (Tex. App.—Austin 2005, pet. denied); *see also Lewis*, 2015 WL 690807, at *12. When, as here, an affirmative defense is not submitted to a jury, we review the record to determine whether the defense was conclusively established. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222–23 (Tex. 1992); *Hayes*, 507

50

S.W.3d at 278. To the extent that such a ruling is based on a question of law, we review that aspect of the ruling de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) ("[Q]uestions of law are always subject to de novo review."); *see also Elliott v. Whitten*, No. 01-02-00065-CV, 2004 WL 2115420, at *3 (Tex. App.—Houston [1st Dist.] Sep. 23, 2004, pet. denied) (mem. op.).

A demand is not excessive simply because it is greater than what the jury later determines is actually due. *Hernandez v. Lautensack*, 201 S.W.3d 771, 777 (Tex. App.— Fort Worth 2006, pet. denied); *Pratt v. Trinity Projects, Inc.,* 26 S.W.3d 767, 769 (Tex. App.—Beaumont 2000, pet. denied). The dispositive inquiry for determining whether a demand is excessive is whether the claimant acted unreasonably or in bad faith. *Lautensack*, 201 S.W.3d at 777; *see also Lewis*, 2015 WL 690807, at *12. In other words, if the claimant made an excessive presuit demand and would not take a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter; however, we note that the doctrine does not bar recovery of attorney's fees expended before the excessive demand. *See State Farm Lloyds v. Fuentes* (*Fuentes II*), 549 S.W.3d 585, 588 (Tex. 2018) (per curiam); *Findlay*, 611 S.W.2d at 58 (instructing that the prohibition on recovery of attorney's fees following an excessive demand applies only when there is evidence of tender refusal or indication that such a tender would be refused by the demanding party).

The Supreme Court of Texas, however, has recently observed that it has "never addressed whether the excessive-demand defense applies when insureds make an excessive demand on their insurer." *Fuentes II*, 549 S.W.3d at 588. In *Fuentes II*, the Court stipulated that "[e]ven if it does," it found "no fault" in the lower court's analysis of

the rule and affirmed. *See id.* (citing *State Farm Lloyds v. Fuentes* (*Fuentes I*), No. 14-14-00824-CV, 2016 WL 1389831, at *7 (Tex. App.—Houston [14th Dist.] Apr. 7, 2016) (mem. op.), *aff'd in part, vacated in part*, 549 S.W.3d 585). Like the *Fuentes II* Court, we will assume but not decide that the excessive-demand defense applies when insureds make an excessive demand on their insurer.

In *Fuentes I,* the court of appeals followed the same analysis commonly used in the context of debtor-creditor presuit demands. In that context, the evidence must clearly indicate that the insured would refuse tender by the insurer of any amount less than the excessive demand for the affirmative defense to apply. *See Fuentes II*, 549 S.W.3d at 588; *see also Fuentes I*, 2016 WL 1389831, at *7.

The record shows that appellants pleaded the affirmative defense of excessive demand and requested—but were denied—a jury question on the reasonableness of the pre-suit demand. Appellants now raise this issue on appeal, arguing that in the Jameses' initial demand for payment, they sought over $600,000 in damages: $408,000 in economic damages, $50,000 in mental anguish damages, and $163,200 "for expenses, including attorney's fees." Appellants argue the Jameses "demanded over five times the policy limits and over $160,000 in attorney's fees where no lawsuit had been filed," and consequently, their unreasonable pre-suit demand bars any recovery of attorney's fees. Appellants, however, point to no evidence of the Jameses' refusal to accept an amount less than what was requested—an element required to prevail under its affirmative defense theory. *See Fuentes II*, 549 S.W.3d at 588; *Findlay,* 611 S.W.2d at 58.

In a "Notice Letter" dated September 24, 2007, the Jameses advised appellants of their specific complaints and the amount of actual damages, expenses, and attorney's fees sought. The letter additionally stated, in part:

> This demand is made in the spirit of compromise. According to our analysis, this demand represents a tremendous savings to you given your potential exposure under the Texas Insurance Code. Thus, we hope this demand is viewed as a good faith and conservative effort on our part to expeditiously resolve this potential litigation on amicable terms.

> If my clients' claim is not paid within sixty (60) days from the receipt of this correspondence, we would expect to recover their actual damages, along with damages for mental anguish, prejudgment interest, attorney's fees and breach of the duty of good faith and fair dealing you owe Mr. and Mrs. James. In addition, please be aware that recovery in the form of treble damages and additional penalties will also be sought.

> As Mr. and Mrs. James are anxious to have this matter resolved promptly, we trust you will immediately respond, in writing, to this formal demand letter. . .

The letter does not indicate that the Jameses would refuse to accept any hypothetical tendering of the actual amount due under the policy. *See Fuentes II*, 549 S.W.3d at 588; *Hayes*, 507 S.W.3d at 282; *Lautensack*, 201 S.W.3d at 777–78 (holding that, where "the record contains no evidence that [the defendant] ever tendered the amount actually due, that [the plaintiff] refused any such tender, or that [the plaintiff] indicated to [the defendant] that such a tender would be refused," the trial court did not err by awarding attorney's fees to the plaintiff); *see also Lewis*, 2015 WL 690807, at *12 (same); *cf. McAlister v. Hatbreeze Properties, L.L.C.*, No. 02-11-00060-CV, 2012 WL 579436, at *8 (Tex. App.—Fort Worth Feb. 23, 2012, no pet.) (mem. op.) (providing that language in a demand letter requiring a defendant to "pay the full $192,000 or else" suit would follow "indicates [a plaintiff's] unwillingness to accept the actual amount due"). Appellants point to no evidence of refusal, and the Jameses testified to the contrary at trial. We conclude that

53

the trial court did not err in refusing attorney's fees on this basis. *See Fuentes II*, 549 S.W.3d at 588; *see also Fuentes I*, 2016 WL 1389831, at *7.

We overrule issue ten.[25]

## V. NEW TRIAL

Appellants argue in issues eleven through thirteen that the trial court erred in failing to grant a new trial because the jury received erroneous charge instructions, the trial court erroneously excluded relevant evidence, and the trial court erroneously admitted irrelevant evidence prejudicial to appellants.

### A. Jury Charge

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018) (citing *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). The trial court has considerable discretion to determine proper jury instructions, and the "instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence." *Id.* An appellate court will not reverse a judgment for a charge error unless that error "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a); *see Glenn v. Leal*, 596 S.W.3d 769, 772 (Tex. 2020) (per curiam). "Charge error

---

[25] We briefly address appellants' ancillary argument that the trial court erred in excluding an instruction on appellants' affirmative defense. To be included in the charge, a question or instruction must be supported by the pleadings and the evidence. *See* TEX. R. CIV. P. 278; *Thota v. Young,* 366 S.W.3d 678, 693 (Tex. 2012); *see also Nat'l Lloyds Ins. Co. v. Lewis*, No. 09-13-00413-CV, 2015 WL 690807, at *12 (Tex. App.—Beaumont Feb. 19, 2015, pet. denied) (mem. op.). Appellants raised the issue of excessive demand in their pleadings. However, as explained above, the evidence did not demonstrate that the Jameses made an excessive demand. Thus, the trial court did not abuse its discretion in its refusal to include said instruction. *See Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018) ("[Charge] instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence."). We overrule the charge error portion of issue ten.

54

is generally considered harmful if it relates to a contested, critical issue." *Glenn*, 596 S.W.3d at 772 (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)). "Error in the omission of an issue is harmless 'when the findings of the jury in answer to other issues are sufficient to support the judgment.'" *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam) (quoting *Boatland of Hous., Inc. v. Bailey,* 609 S.W.2d 743, 750 (Tex. 1980)); *see also City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex. 1995) (providing that a jury question may be immaterial, and therefore its submission harmless, "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict"). We look to the entire record to determine whether the jury charge probably caused an improper judgment. *In re Commitment of Briggs*, 350 S.W.3d 362, 366 (Tex. App.—Beaumont 2011, pet. denied).

### 1. Valid and Invalid Theories of Liability

Citing exclusively to *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000), TWIA narrowly argues that "the trial court improperly combined valid and invalid theories of liability in Question Nos. 1, 9, and 13 of the Court's Charge."

In *Casteel*, the trial court "submitted a single broad-form question on the issue of Crown's liability to Casteel." *Id.* at 387. The question instructed the jury on thirteen independent grounds for liability and requested a single answer on liability, which the jury answered affirmatively. *Id.* The Supreme Court of Texas found that four of the thirteen theories in the single liability question were improperly included[26] and held that the trial

---

[26] The Court in *Casteel* observed that four of the theories had been improperly submitted because they required that Casteel be a consumer. Yet the language of these theories was altered to remove any reference to their consumer-status requirements. Thus, the jury was confronted with four liability theories available only to consumers, but was given no indication that Casteel was required to be a consumer to succeed under any of them. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000).

court erred by submitting the invalid grounds for liability in the charge. *Id.* The court concluded that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.*; *see Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) (noting that the Texas Supreme Court has specifically limited its holding in *Casteel* and its progeny to the submission of broad-form questions incorporating multiple theories of liability or multiple damage elements).

We find no commingling of valid and invalid theories here. The trial court issued the following objected-to instructions:

QUESTION NO. 1:

Did [TWIA] fail to comply with the insurance policy with regard to the following coverages?

The TWIA Dwelling Policy covers direct physical loss to the covered property caused by windstorm or hail during the policy period.

Answer "Yes" or "No" for each item listed below:

Dwelling: Yes
ALE: Yes
Personal Property: Yes

. . .

QUESTION NO. 9:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David and Sue James for their damages, if any, that resulted from the failure to comply you found in response to Question No. 1?

. . .

Consider the following elements of damages, if any, and none other:

The difference, if any, between the amount that TWIA should have paid David and Sue James for their covered loss under the policy and the amount TWIA paid to David and Sue James for their covered loss under the policy.

Answer in dollars and cents for damages, if any.

Dwelling: $33,000.00
ALE: $8,000.00
Personal Property: $10,000.00

. . .

QUESTION NO. 13:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David and Sue James for their damages, if any, that were caused by an unfair or deceptive act?

Consider the following elements of damages, if any, and none other:

The difference, if any, between the amount that TWIA should have paid David and Sue James for their covered loss under the policy and the amount TWIA paid to David and Sue James for their covered loss under the policy.

Answer in dollars and cents for damages, if any.

Dwelling: $33,000.00
ALE: $8,000.00
Personal Property: $10,000.00

TWIA reasons that the trial court erred in failing to define "dwelling" because the issue of "dwelling" presents dual theories of liability—i.e., TWIA could be liable for damages involving the exterior *or* interior of an insured's premises. Assuming without deciding that "dwelling" presents dual theories of liability, there would only be error if either theory was invalid. *See Casteel*, 22 S.W.3d at 389.

TWIA does not dispute that the policy provides coverage for the interior and exterior premises. Instead, TWIA claims that because they paid the Jameses under the

policy "for all exterior damage," the Jameses could only contest liability for interior damages at trial. The Jameses, however, challenged TWIA's assertion that they had been completely paid out of the policy for exterior damages. The Jameses presented testimony from their experts of damage observed and estimated exterior damage costs that exceeded the payment received from TWIA for exterior damage. Moreover, the charge instructed jurors to consider evidence of any difference in amount between what TWIA "should have paid" the Jameses and the amount TWIA did pay. To the extent that exterior and interior damage exist as dual theories, the existence of the Jameses' claim to interior damages went unchallenged, and there existed evidence of a claim for exterior damage beyond what was paid by TWIA for the jury to consider. Thus, having reviewed the evidence and charge, we conclude there was no commingling of valid and invalid theories. *See id.*

We overrule issue eleven.

### 2. Spoliation Instruction

Appellants next assert by their twelfth issue that the Jameses were responsible for the spoliation of several items of evidence and that the trial court should have included a spoliation instruction in the charge.

"The spoliation of evidence is a serious issue." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 16–17 (Tex. 2014). "A party's failure to reasonably preserve discoverable evidence may significantly hamper the non-spoliating party's ability to present its claims or defenses, and can undermine the truth-seeking function of the judicial system and the adjudicatory process." *Id.* (internal quotations omitted). A spoliation instruction "is given to compensate for the absence of evidence that a party had a duty to preserve[.]" *Wal–*

*Mart Stores v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003); *Telesis/Parkwood Ret. I, Ltd. v. Anderson*, 462 S.W.3d 212, 253 (Tex. App.—El Paso 2015, no pet.). A party alleging spoliation, therefore, "bears the burden of establishing that the nonproducing party had a duty to preserve the evidence," and the nonproducing party "intentionally spoliate[d] evidence in order for a spoliation instruction to constitute an appropriate remedy." *Aldridge*, 438 S.W.3d at 20, 23–24. "[A] trial court's finding of intentional spoliation . . . is a necessary predicate to the proper submission of a spoliation instruction to the jury." *Id.* at 25.

Appellants allege the Jameses "failed to meaningfully document the damage from Hurricane Rita, refused to allow TWIA to inspect or document the damage, and then destroyed all evidence of the damage by gutting the interior of the property before even their own public adjuster and experts could inspect it." However, apart from appellants' assertions, nothing in the record suggests that the Jameses acted to intentionally conceal or destroy the aforementioned evidence. *See id.* The Jameses testified they extensively documented and photographed the property's exterior and interior damage and mailed related documents and photographs to appellants. Though appellants maintain they never received the mailing and argue the Jameses should have maintained copies for their own records or sent the mailings certified, such arguable lapse in judgment is not evidence of intentional concealment or destruction of evidence. *See id.* The Jameses also testified to their intentions behind "gut[ting]" their home, explicitly denying that they were trying "to put one over on TWIA." Sue testified that by the time they began "taking down sheetrock" and "taking out insulation," more than six months had elapsed since the hurricane hit and rendered the home uninhabitable. The Jameses asserted that by

59

removing the damaged sheetrock and insulation, they were abiding by the terms of the policy, which required that they "protect the property from further damage" and "make reasonable, necessary, and temporary repairs to protect the home." Moreover, as we have discussed *supra* and though appellants contend otherwise, there was evidence presented to support the jury's findings that the Jameses *did* allow appellants to inspect the damage as often as reasonably required under the policy.

Having reviewed the record and finding no substantiation of intentional concealment or destruction of evidence, we conclude that the trial court did not err by refusing to submit appellants' requested spoliation instruction. *See id.* at 23–24; *see also Nat'l Sec. Fire & Cas. Co. v. Lampson*, No. 09-15-00299-CV, 2016 WL 7018302, at *10–11 (Tex. App.—Beaumont Dec. 1, 2016, pet. denied) (mem. op.).

Issue twelve is overruled.

## B. Admission of Relevant Evidence

By their thirteenth issue, appellants contend it was reversible error for the trial court to admit evidence of emails regarding oversight concerns by the Texas Department of Insurance (TDI) and emails concerning the relationship between TWIA and Brush Country.[27]

The Texas Rules of Evidence provide for the general admissibility of all evidence having any tendency to make a fact of consequence more or less probable. *See* TEX. R. EVID. 401, 402; *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 544 (Tex.

---

[27] Appellants do not cite any authority in support of their contentions. *See* TEX. R. APP. P. 38.1(i); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 500 (Tex. 2015) ("Failure to provide citations or argument and analysis as to an appellate issue may waive it."). That said, in the interest of justice, this Court may address an appellant's issue if we can determine, with reasonable certainty, the alleged error about which a complaint is made—which we do here. *See Borne v. State*, 593 S.W.3d 404, 409 (Tex. App.—Beaumont 2020, no pet.).

60

2018). "Even if relevant, however, evidence may be excluded 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.'" *Williams*, 542 S.W.3d at 544 (quoting TEX. R. EVID. 403). When a Rule 403 objection is at issue, the trial court must balance probative value against the relevant countervailing factors to determine admissibility. *Id.* The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement. *Id.* at 545 ("Being present in the courtroom and having the most familiarity with the case, the trial court is best positioned to assess whether evidence is unfair or potentially misleading."); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

"To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting TEX. R. APP. P. 44.1(a)(1)); *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). In conducting this harm analysis, "[w]e review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *McShane*, 239 S.W.3d at 234; *see also In re A.M.*, No. 09-19-00075-CV, 2019 WL 4064579, at *10 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.).

Appellants specifically dispute the admittance of the following evidence: (1) "a February 2011 letter from the [TDI], informing TWIA that it was being placed under administrative oversight," and (2) two sets of emails from 2008 and 2009.

### 1. "February 2011 Letter"

The "February 2011 Letter" is comprised of two separate letters admitted as a single exhibit. In a letter dated February 23, 2011, TDI notified TWIA's general manager, James Oliver, of an impending "target examination" of TWIA. The letter read, in part:

> This examination is commencing immediately and will focus on information maintained by TWIA regarding the employment, performance, and termination and/or resignation of Reggie Warren and Bill Knarr, as well as inappropriate, unprofessional, or unethical conduct that may have led to the resignation, termination or separation of any staff with the level, title, or responsibilities commensurate of "vice president."

In a letter dated February 28, 2011, TDI declared the "Commissioner of Insurance is placing TWIA under administrative oversight" following its determination that TWIA "is in a condition that makes its continuation in business hazardous to the public or to its policyholders, at [sic] it appears that its management does not have the experience, competence, or trustworthiness to operate TWIA in a safe and sound manner." The letter dictated that the opinion was "based, in part, upon information gathered by or submitted to the staff of the [TDI]," indicating

> (a) in multiple instances, an outside claims adjuster was paid for adjusting work that appears not to have been performed and that TWIA paid claims based on that outside adjuster's recommendation; (b) TWIA management was aware of this and failed to report it in writing to the Department's insurance fraud unit not later than the 30th day after the date of making the determination or reasonably suspecting that a fraudulent insurance act had been committed; and (c) TWIA has failed to adequately address issues identified through the recent financial examination and subsequent financial analysis indicating a lack of adequate controls over accounting, personnel, and material decisions affecting day-to-day operations, as well as communications with staff, the board of directors, and [TDI].

In arguing this exhibit was unduly prejudicial under Rule 403, appellants assert that the letter was "irrelevant and prejudicial because it had nothing to do with the James[es]' insurance claim," and the TDI investigation "occurred more than three years after Rita and was triggered by an adjuster overpaying Hurricane Dolly claims." At the crux of the suit, however, are the Jameses' accusations that TWIA mishandled their insurance claim in violation of several Texas Insurance Code provisions. Although the letters are dated some years after the Jameses' claim was denied, Mills confirmed that appellants submitted the Jameses' file to TDI for review in accordance with the mandate, and the second letter makes an explicit reference to Warren, the individual who "ultimately decided to deny [the Jameses'] claim."

Assuming, without deciding, that the trial court's decision fell outside the zone of reasonable disagreement and there exists no logical connection either directly or by inference between the evidence and a fact to be proved, a review of the entire record does not support a finding that the judgment turned on this admitted evidence. *See Williams*, 542 S.W.3d at 544; *McShane*, 239 S.W.3d at 234; *Robinson*, 923 S.W.2d at 558; *see also In re A.M.*, No. 09-19-00075-CV, 2019 WL 4064579, at *10 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.).

### 2. Emails

Appellants separately argue the relevancy of four emails admitted at trial. However, as discussed, in order to obtain reversal based on an error in the admission or exclusion of evidence, an appellant must show that the ruling (1) probably caused the rendition of an improper judgment or (2) probably prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1(a). In their briefs on appeal,

63

appellants do not allege or argue that the trial court's evidentiary rulings met this standard for reversible error. *See id.* R. 38.1(i), 44.1(a). Therefore, we conclude that appellants have failed to establish that any error in the trial court's evidentiary rulings would be reversible. *See id.*

We overrule issue thirteen.

## VI.    FORM OF JUDGMENT CHALLENGES

By issues fourteen through sixteen, appellants argue: Sue was without standing to recover under the policy benefits; the trial court erred in awarding the Jameses' prejudgment interest beginning when the claim was filed; the Jameses' inability to recover policy benefits precludes recovery of penalty interest under Chapter 542 of the insurance code; and Chapter 541 inhibits the Jameses' ability to recover damages from appellants as a matter of law.

### A.    Sue's Standing

Appellants' argument for this issue reads in its entirety as follows:

> The policy expressly states that it is issued by TWIA to David James; Sue James is not referenced or mentioned in the policy. DX 1. She therefore has no contractual right to recover policy benefits. Since the jury awarded only policy benefits, she cannot recover on the jury's findings. The jury's findings on her behalf should be disregarded and judgment entered that she take nothing.

Appellants' argument does not contain reference to supporting authorities and is thus inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Lewis v. Tex. Dep't of Family & Protective Servs.*, No. 09-17-00030-CV, 2017 WL 2687509, at *2 (Tex. App.—Beaumont June 22, 2017, no pet.) (mem. op.) (holding appellant waived complaint where appellant "cites to no legal authority to support her argument").

We overrule issue fourteen.

64

**B.    Prejudgment Interest**

Appellants next contend that the trial court erred in awarding the Jameses prejudgment interest during periods of delay that they claim were caused by the Jameses.

"Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)); *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 188 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Aquila Sw. Pipeline, Inc. v. Harmony Expl., Inc.*, 48 S.W.3d 225, 241–42 (Tex. App.—San Antonio 2001, pet. denied). Prejudgment interest accrues from the earlier of: (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed, and until the day before the judgment. *Long v. Castle Tex. Prods. Ltd. P'ship*, 426 S.W.3d 73, 77 (Tex. 2014) (citing *Johnson & Higgins,* 962 S.W.2d at 531). During periods of delay caused by a litigant, the trial court may offset the award of prejudgment interest in consideration of the delay. *See Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 840 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *Helena Chem. Co. v. Wilkins*, 18 S.W.3d 744, 760 (Tex. App.—San Antonio 2000), *aff'd*, 47 S.W.3d 486 (Tex. 2001); *see also Izen v. Laine*, No. 14-18-00216-CV, 2020 WL 3273343, at *13 (Tex. App.—Houston [14th Dist.] June 18, 2020, no pet. h.) (mem. op.).

"Because the offset is discretionary rather than mandatory, we do not substitute our opinion for that of the trial court." *Harmony*, 48 S.W.3d at 242 (citing *Wilkins*, 18 S.W.3d at 760); *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 223–24

65

(Tex. App.—Amarillo 2003, no pet.). The trial court's decision to refuse to offset from its interest calculations periods of delay is reviewed under the abuse of discretion standard. *See Sharifan*, 550 S.W.3d at 840; *Wilkins,* 18 S.W.3d at 760; *see also Izen*, 2020 WL 3273343, at *13. "A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles." *In re Thetford*, 574 S.W.3d 362, 374 (Tex. 2019) (orig. proceeding); *Wilkins,* 18 S.W.3d at 760.

The Jameses' original petition was filed on September 25, 2007, and the case proceeded to trial on February 21, 2017. Appellants make specific reference to the eight-year gap between 2007 and 2015 as evidence of delay brought forth by the Jameses. However, the record fails to demonstrate the reason for the delay. The clerk's record indicates three filings between 2007 and 2015. First, appellants—not the Jameses—filed a "Motion to Transfer Under Rule 13" on October 31, 2008, seeking to consolidate the case with Texas Multidistrict Litigation (MDL) No. 08-0914, styled *In re Texas Windstorm Insurance Association Hurricanes Rita and Humberto Litigation*. On December 11, 2008, appellants filed a "Notice of Transfer." Appellants filed a subsequent "Notice of Transfer" on March 4, 2009, stating that the case was ordered to be transferred and consolidated with the MDL case. The clerk's record is silent until January 5, 2015, when the trial court signed its "Order of Dismissal." Within the week, the Jameses filed a verified motion to reinstate the case.

Under the sparse record before us,[28] we cannot say the trial court abused its discretion in refusing to offset prejudgment interest. *See Freeman*, 134 S.W.3d at 223–

---

[28] The reporter's record is similarly unavailing. We have been provided with no record of any proceedings prior to the February 16, 2017 hearing on appellant's motion for spoliation instruction.

24 (finding no abuse of discretion when case took five years to come to trial because "[i]f appellants felt that appellees were unnecessarily delaying the trial, they could have been more proactive in seeking and holding appellees to a trial setting"); *see also Izen*, 2020 WL 3273343, at *13 (providing that the "trial court could have reasonably decided that it would disregard any delays in the trial date when it calculated the amount of prejudgment interest" where both sides requested delays); *Bledsoe v. Kuczek*, No. 02-02-00255-CV, 2003 WL 21476204, at *3 (Tex. App.—Fort Worth June 26, 2003, no pet.) (mem. op.) (holding that where the record failed to "explain[] why the trial date was subsequently reset," the appellate court could not "determine whether the trial court abused its discretion").

We overrule issue fifteen.[29]

## C. Chapter 541 Damages

Appellants next assert that the Jameses are unable to recover under Chapter 541[30] of the Texas Insurance Code because "section 541.454 restricts the source of payment of Chapter 541 claims to the insurer's capital or surplus funds, and TWIA has no capital or surplus funds". *See* TEX. INS. CODE ANN. § 541.001 (providing that the "purpose of this chapter is to regulate trade practices in the business of insurance"); *id.* at § 541.454.

We review the issue of statutory interpretation de novo. *Lockheed Martin Corp. v. Hegar*, 601 S.W.3d 769, 774 (Tex. 2020) (citing *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d

---

[29] Appellants alternatively assert that the Jameses' inability to recover on a claim for loss under the policy precludes recovery of penalty interest under Chapter 542. *See* TEX. INS. CODE ANN. § 542.060(a) (requiring that the liable insurer "pay the holder of the policy or the beneficiary making the claim under the policy, in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages"). Having determined in favor of the Jameses on this very matter *supra*, we overrule appellants sub-issue.

[30] Chapter 541 is titled "Unfair Methods of Competition and Unfair or Deceptive Acts or Practices." *Id.* § 541.001.

400, 404 (Tex. 2016)). "When we interpret a statute, our purpose is to give effect to the Legislature's intent by looking at its plain and ordinary meaning, 'and then consider the term's usage in other statutes, court decisions, and similar authorities.'" *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 749 (Tex. 2020) (quoting *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)). "When the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended," and "we must honor that difference." *Sneed v. Webre*, 465 S.W.3d 169, 183 (Tex. 2015) (quoting *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 84 (Tex. 2004) (citations omitted)).

Chapter 541 of the insurance code "grants insureds a private action against insurers that engage in certain discriminatory, unfair, deceptive, or bad-faith practices, and it permits insureds to recover 'actual damages . . . caused by' those practices, court costs, and attorney's fees, plus treble damages if the insurer 'knowingly' commits the prohibited act." *Menchaca*, 545 S.W.3d at 488 (quoting TEX. INS. CODE ANN. §§ 541.151, .152); *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 441 (Tex. 2012) (op. on reh'g); *see* TEX. INS. CODE ANN. § 541.060(a) (prohibiting insurers from engaging in a variety of "unfair settlement practices").

Chapter 2210 of the insurance code governs TWIA. *See* TEX. INS. CODE ANN. § 2210.001 (defining the purpose of TWIA); *see Tex. Windstorm Ins. Ass'n v. Poole*, 255 S.W.3d 775, 776 (Tex. App.—Amarillo 2008, pet. denied). Though it has since been repealed, § 2210.552 provided that "a person insured under this chapter who is aggrieved by an act, ruling, or decision of [TWIA] relating to the payment of, the amount of, or the

68

denial of a claim may . . . bring an action against the association, including an action under Chapter 541." Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 2, 2005 Tex. Gen. Laws 1752, 2118 (effective April 1, 2007 and repealed 2011) (former TEX. INS. CODE ANN. § 2210.552(a)(1)). Section 2210.552 was in effect during the Jameses' policy period and at the time of filing suit. Appellants do not acknowledge this provision in their brief, and we find no reason for why the Jameses would be precluded from an avenue of redress— here, Chapter 541—explicitly made available by the controlling statute. *See id.*; *Sneed*, 465 S.W.3d at 183; *Poole*, 255 S.W.3d at 778.

We overrule issue sixteen.

## VII. CONCLUSION

We reverse the portion of the trial court's judgment awarding the Jameses a recovery on extra-contractual claims against Gutierrez and Brush Country, and we render judgment that the Jameses take nothing by way of those claims. The remainder of the judgment is affirmed.

GREGORY T. PERKES
Justice

Delivered and filed the
20th day of August, 2020.

69